1

2

3

4

5

6

7

8                IN THE UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10   RONNIE WINN,

11           Petitioner,              No. 2:03-cv-2347 JAM KJN P

12       vs.

13   ANTHONY LAMARQUE,

14           Respondent.          FINDINGS AND RECOMMENDATIONS

15   _____/

16   I.  Introduction

17           Petitioner is a state prisoner proceeding through counsel with a petition for writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2000 conviction for

19   involuntary manslaughter (Cal. Penal Code § 192(b)) and misdemeanor battery (Cal Penal Code

20   § 242).  Petitioner is serving a sentence of 25 years to life pursuant to the Three Strikes Law and

21   two consecutive one years terms.

22           This action is proceeding on the original petition filed November 10, 2003, as to

23   the following claims: (1) ineffective assistance of counsel (4 claims); (2) jury instruction error (4

24   claims); and (3) insufficient evidence to support finding of prior robbery conviction.  (Dkt. No.

25   1.)  Petitioner also requests an evidentiary hearing as to claim one.

26           On January 24, 2005, respondent filed an answer.  (Dkt. No. 23.)  On March 25,

1

1  2005, petitioner's counsel filed a traverse on petitioner's behalf.  (Dkt. No. 30.)

2          The petition also contains a tenth claim alleging ineffective assistance of appellate

3  counsel.  Petitioner abandoned this claim in the traverse.

4          After carefully considering the record, the undersigned orders that the request for

5  an evidentiary hearing is denied and recommends that the petition be denied.

6  II.  Anti-Terrorism and Effective Death Penalty Act (AEDPA)

7          The Anti-Terrorism and Effective Death Penalty Act ("AEDPA") "worked

8  substantial changes to the law of habeas corpus," establishing more deferential standards of

9  review to be used by a federal habeas court in assessing a state court's adjudication of a criminal

10  defendant's claims of constitutional error.  Moore v. Calderon, 108 F.3d 261, 263 (9th Cir.

11  1997).

12          In Williams (Terry) v. Taylor, 529 U.S. 362 (2000), the Supreme Court defined

13  the operative review standard set forth in § 2254(d).  Justice O'Connor's opinion for Section II of

14  the opinion constitutes the majority opinion of the court.  There is a dichotomy between

15  "contrary to" clearly established law as enunciated by the Supreme Court, and an "unreasonable

16  application of" that law.  Id. at 405.  "Contrary to" clearly established law applies to two

17  situations:  (1) where the state court legal conclusion is opposite that of the Supreme Court on a

18  point of law; or (2) if the state court case is materially indistinguishable from a Supreme Court

19  case, i.e., on point factually, yet the legal result is opposite.

20          "Unreasonable application" of established law, on the other hand, applies to

21  mixed questions of law and fact, that is, the application of law to fact where there are no factually

22  on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

23  Id. at 407-08.  It is this prong of the AEDPA standard of review which directs deference to be

24  paid to state court decisions.  While the deference is not blindly automatic, "the most important

25  point is that an *unreasonable* application of federal law is different from an incorrect application

26  of law....[A] federal habeas court may not issue the writ simply because that court concludes in

1  its independent judgment that the relevant state-court decision applied clearly established federal

2  law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 410-

3  11 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the

4  objectively unreasonable nature of the state court decision in light of controlling Supreme Court

5  authority.  Woodford v. Viscotti, 537 U.S. 19 (2002).

6         "Clearly established" law is law that has been "squarely addressed" by the United

7  States Supreme Court.  Wright v. Van Patten, 552 U.S. 120 (2008).  Thus, extrapolations of

8  settled law to unique situations will not qualify as clearly established.  See e.g., Carey v.

9  Musladin, 549 U.S. 70, 76 (2006) (established law not permitting state sponsored practices to

10  inject bias into a criminal proceeding by compelling a defendant to wear prison clothing or by

11  unnecessary showing of uniformed guards does not qualify as clearly established law when

12  spectators' conduct is the alleged cause of bias injection).

13         The state courts need not have cited to federal authority, or even have indicated

14  awareness of federal authority, in arriving at their decision.  Early v. Packer, 537 U.S. 3 (2002).

15  Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an

16  unreasonable application of, established Supreme Court authority.  Id.  An unreasonable error is

17  one in excess of even a reviewing court's perception that "clear error" has occurred.  Lockyer v.

18  Andrade, 538 U.S. 63, 75-76 (2003).  Moreover, the established Supreme Court authority

19  reviewed must be a pronouncement on constitutional principles, or other controlling federal law,

20  as opposed to a pronouncement of statutes or rules binding only on federal courts.  Early v.

21  Packer, 537 U.S. at 9.

22         However, where the state courts have not addressed the constitutional issue in

23  dispute in any reasoned opinion, the federal court will independently review the record in

24  adjudication of that issue.  "Independent review of the record is not de novo review of the

25  constitutional issue, but rather, the only method by which we can determine whether a silent state

26  court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

1   2003).

2   When reviewing a state court's summary denial of a claim, the court "looks

3   through" the summary disposition to the last reasoned decision.  Shackleford v. Hubbard, 234

4   F.3d 1072, 1079 n. 2 (9th Cir. 2000).

5   III.  Factual Background

6   The opinion of the California Court of Appeal on direct appeal contains a factual

7   summary of petitioner's offense.  After independently reviewing the record, the court finds this

8   summary to be accurate and adopts it herein.

9   I. FACTS AND PROCEDURAL HISTORY

10  On the evening of May 28, 1999, appellant walked into an apartment where
    victims James Rendleman and Jay Badial resided.  Rendleman, Badial, and their
11  friend Ed Nunez, as well as several other men and women were watching
    television and drinking, in an informal social gathering.

12  Appellant gained entry into the apartment without permission, by passing through
13  the open front door and a closed but unlocked screen door.  Badial, who was
    familiar with appellant, ordered appellant to "get the F out," but appellant did not
14  leave.  Instead of leaving, appellant became embroiled with Badial and
    Rendleman in an apparent dispute over an $8 debt owed to him by Rendleman's
15  former girlfriend.  Although Nunez gave appellant $5, appellant was not satisfied
    and kept asking for the balance of $3.  Throughout this argument, Badial kept
16  yelling for appellant to leave, but he used no force to expel him from the
    apartment.

17
    Appellant was the first to resort to violence.  He hit Badial in the face, and then
18  grabbed Badial around the throat and choked him until Badial began to lose
    consciousness.  Rendleman tried to defend Badial by striking appellant over the
19  head with a large, 40-ounce beer bottle.  This dazed appellant, and also made him
    angry.  Appellant then proceeded to beat, kick, and "stomp" the head of
20  Rendleman, a man of about 60, causing head and brain injuries that resulted in his
    death a month later.

21
    Appellant was later arrested and interviewed by the authorities.  In his voluntary
22  statement to the police, appellant admitted fighting with the two men (Rendleman
    and Badial).  He at first denied kicking Rendleman, but somewhat later in the
23  interview, he admitted kicking Rendleman, though not in the head.  Appellant also
    claimed he acted in self-defense.

24
    The two-count information charged appellant with the murder of Rendleman
25  (count I) and the misdemeanor battery of Badial (count II).  (Pen.Code, §§ 187,
    subd. (a); 242) (FN2)  The pleading also charged two prior serious felony
26  convictions or "strikes," convictions of robbery in 1976 and 1983 (§§ 667, subd.

4

(a)(1); 1170.12), and two prison term prior convictions of petty theft with a prior (§ 666) in 1992.  (§ 667.5.)

> FN2.  All further section references are to the [California] Penal Code.

Before jury selection, the court took up various motions in limine, as well as other legal matters that might arise in the course of the trial.  Among the matters addressed were appellant's prior convictions, their possible use for impeachment, and whether the prior conviction allegations should be bifurcated for trial separate from the pending charges.

Defense counsel advised the court, "Mr. Winn has anticipated he would testify.  And I would ask that any impeachment regarding the felonies just be the ones that are alleged in the charging document ..." (FN3).  The court ruled: "There has been no motion to bifurcate, so I'll be advising the jury one of their functions would be to find, to determine whether or not the defendant is, I think there are four felonies, two 666's and two 211's."

> FN3.  Appellant had numerous other convictions, in addition to the four charged in the information.

Both sides were then asked to state their thoughts as to whether anything should be said about the fact that this case was being prosecuted under the three strikes law.  At the urging of the prosecutor, the court ordered that no mention be made of the three strikes law before the jury.

The prosecution's first witness was Sergeant Jose Cueva, of the Solano County Sheriff's Office who, on the evening of May 28, 1999, responded to a call of an assault in progress at an apartment complex on Benicia Road, in an unincorporated area near the city of Vallejo.  Cueva approached the victims' apartment.  He found the door partially open, and two injured men were inside, Rendleman and Badial.

Rendleman had blood on his face and other injuries which had caused swelling in his facial area.  Cueva noticed that Rendleman was attempting to stand, but he fell over.  He had an obvious injury to his face which looked like the impression of the sole of a shoe, possibly the pattern of the bottom of a tennis shoe.  The pattern did not match the shoes worn by Badial.  Nor did Badial have any visible injury or blood on his hands.  Cueva attempted to take a statement from Rendleman, but Rendleman was going in and out of consciousness and was unable to say anything coherent.  Rendleman mumbled a name that sounded like "Cal Johnson" but no such person was found to exist.

Cueva detained another person who had earlier been inside the apartment, Jay King.  King also had no injury to his hands, and his shoes did not match the pattern of the facial injury to Rendleman.  Cueva sought to check appellant's shoes and hands, but when he arrived at the nearby apartment where appellant had been staying, appellant had left.

Susan Hogan, M.D., a forensic pathologist who performed the autopsy on Rendleman, offered that the victim had suffered numerous injuries to his face,

5

head, and chest, consistent with being beaten and kicked.  His face bore a "hexagonal waffle pattern" from the sole of a shoe, which was consistent with being "stomped."  Although Rendleman suffered from cirrhosis of the liver, Hogan opined that this did not cause his death.  Hogan added that persons with cirrhosis will hemorrhage more easily, but they will not spontaneously hemorrhage.

The cause of Rendleman's death was determined to be "closed head injuries due to blunt force trauma to the head."  Blows administered to his head resulted in brain injuries, including bleeding and swelling, which was consistent with being kicked or "stomped" in the head, while his head was on the floor.

Solano County Deputy Sheriff Paul Jaworski accompanied Sergeant Cueva in responding to the victims' apartment on the evening of May 28, 1999, shortly after 9:00 p.m.  He assessed Rendleman as "severely injured," and Badial as less seriously injured but "very upset" and "very emotional" over the injuries to his friend Rendleman.  Jaworski noticed that Badial had no injuries to his hands.

Two of the guests at the apartment, Bridget Hull and Susan Reid, had earlier come over for an informal social gathering on the evening of May 28, 1999.  Hull stated that the television was on, and people were sitting around talking and drinking, when a "guy outside" came into the apartment, pushing his way in even though he was told not to come in.  Hull identified this intruder as appellant.

Hull overheard appellant speaking to Rendleman about something, while Badial was telling appellant to "get out" and was "clowning around" behind appellant's back, without touching him.  Appellant turned on Badial and struck him in the face, then "grabbed him and pushed him on the wall and strangled him."  Appellant then lifted Badial, who is a small man, off the floor and pinned him against a wall while strangling him around the neck.  Badial's eyes and face began to swell as the result of appellant's stranglehold.

Rendleman, who had been sitting down, urged appellant to stop and release Badial.  When appellant did not stop, Rendleman hit him over the head with a large beer bottle, which shattered.  Appellant shook his head.  At this point, Hull became scared and left.

Badial confirmed Hull's account of these events.  Appellant entered the apartment without permission, refused to leave, and spoke with Rendleman about $8 he said he was owed.  After Nunez gave appellant $5, appellant wanted more and became angry.  Badial kept telling appellant to leave, but appellant punched him in the face, grabbed his neck, and began choking him.  As Badial began to black out, he heard the shattering of glass, and was released.  Although groggy from the experience, Badial witnessed appellant beating or punching Rendleman in the face and head.  After appellant left, Badial went to the phone to dial 911, but the police had already been called.

Ed Nunez also witnessed appellant enter the apartment and Badial ordering him to leave.  When appellant "picked [Badial] up by his throat," and Badial was being choked or strangled, Rendleman tried to defend his friend by striking appellant over the head with a large beer bottle.  Appellant was wearing a hat which

muffled the blow, but the bottle nevertheless shattered.  Appellant was momentarily stunned and asked what had happened.  Appellant soon began hitting Rendleman in the face and kicking him in the head, after Rendleman was knocked down.  As Nunez tried to get him to stop, appellant kept "stomping" Rendleman in the head and kicking him in the side.  Appellant was stomping and "grinding" his shoe into Rendleman's face.  Nunez could see that Rendleman was "hurt bad" and was "gurgling" and having trouble breathing.  Then Nunez left because he was scared.

Detective Eric Thelen of the Solano County Sheriff's Office was assigned to investigate the crimes.  Thelen interviewed appellant on June 21, 1999, and a videotape recording and a transcript of this interview was prepared.  The sound on the recording was not always audible, and therefore the videotape was played while jurors read from copies of transcripts prepared of the recording.

After waiving his Miranda rights, appellant agreed to talk about the events of May 28, 1999 (FN4).  Appellant told Detective Thelen that he went to the victims' apartment to give $5 to Ed Nunez, but Badial told him to leave.  Badial "grab me, spin me around like this."  When appellant then grabbed Badial around the neck, Rendleman struck him over the head with a beer bottle.  Appellant was stunned and tried to fight back.  Then Nunez began defending appellant, by beating and stomping Rendleman, while appellant was helped out of the apartment and down the stairs by his longtime friend Linda Crawford.

       FN4.  Miranda v. Arizona (1966) 384 U.S. 436.

Appellant admitted hitting Badial in the face and choking him, but he at first denied kicking, or "stomping" Rendleman.  Appellant blamed Rendleman's injuries on Nunez, who had earlier fought with Rendleman.  Later in the interview, and after the police accused appellant of lying, appellant acknowledged that he struck Rendleman and kicked him in the chest, but denied kicking or stomping him in the head.

Following Detective Thelen's testimony, and at the close of [the] prosecution's case in chief, certified copies of abstracts of judgments and other documents relating to the four prior convictions charged in the information were offered and moved into evidence.

The defense called various witnesses to challenge the prosecution's case.  Nunez was recalled to describe a fight he had with Rendleman just a few days before the May 28, 1999, incident.  As Nunez explained it, the two men had been drinking.  A misunderstanding arose which resulted in both Simone Grimes and Nunez hitting Rendleman, but Nunez denied that either he or Grimes kicked Rendleman down the stairs.  In response to the question, whether he recalled appellant coming up and helping Rendleman back into his apartment, Nunez answered: "I don't quite remember, but he did come in the house.  He did come in the house."  The next day, Nunez and Rendleman shook hands and put the misunderstanding behind them.

Simone Grimes was also inside the victims' apartment on May 28, 1999, when appellant walked in and demanded money from Rendleman.  She witnessed

7

appellant assault Badial, and Rendleman hit appellant over the head with a beer bottle. At that point, Grimes left the apartment, but soon returned to retrieve her car keys. When she returned, Grimes saw Rendleman on the floor, injured and bleeding. His face did not look as badly swollen as it did in the photographs depicting his injuries. Badial and Nunez were present in the apartment. Grimes admitted that a few days before, Rendleman said something she didn't like, so she pushed him.

Finally, appellant's longtime friend Linda Crawford testified that on the evening of May 28, 1999, she was talking with Jay King when she heard screaming and calls for help from appellant. She looked upstairs and saw appellant, who had been hit. Appellant re-entered Rendleman's apartment, and Crawford followed him inside. There she saw Rendleman standing with his fists clenched in a fighting position. Appellant started toward Rendleman, but Crawford restrained him. She then left with appellant, returning to Crawford's house. Appellant, who kept his clothes at Crawford's place, changed his clothing after the fight. Crawford believed he was wearing dress shoes, not tennis shoes, and that appellant also changed shoes at her house. Crawford did not talk to Detective Thelen when he tried to ask her about these events, because she was ill.

Detective Thelen's rebuttal testimony offered that he had repeatedly attempted to contact and interview Crawford, but she at first declined to speak with him, claiming illness. When an interview was held, Crawford advised Thelen that she was not with appellant at the apartment on the evening of the attack, and appellant only arrived at her place later in the evening.

The jury was instructed on murder in the second degree and involuntary manslaughter. Appellant was found not guilty of murder in the second degree, but guilty of involuntary manslaughter. He was sentenced to the term of 25 years to life for the felony of involuntary manslaughter, under the three strikes law, plus two consecutive one-year terms for the prison term prior convictions found true under section 667.5, for an aggregate term of 27 years to life. A concurrent six-month term for misdemeanor battery (count II) was also imposed.

(Respondent's Exhibit 7, pp. 2-8.)[1]

IV. Discussion

       A. Ineffective Assistance of Counsel (Claims 1-4)

       *Standards for Ineffective Assistance of Counsel*

       The test for demonstrating ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668 (1984). First, a petitioner must show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness.

_____

    [1] All of the cited exhibits and Reporter's Transcript ("RT") were filed or lodged with this court.

1   Id. at 688.  To this end, the petitioner must identify the acts or omissions that are alleged not to

2   have been the result of reasonable professional judgment.  Id. at 690.  The federal court must then

3   determine whether in light of all the circumstances, the identified acts or omissions were outside

4   the wide range of professional competent assistance.  Id.  "We strongly presume that counsel's

5   conduct was within the wide range of reasonable assistance, and that he exercised acceptable

6   professional judgment in all significant decisions made."  Hughes v. Borg, 898 F.2d 695, 702

7   (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).

8         Second, a petitioner must affirmatively prove prejudice.  Strickland, 466 U.S. at

9   693.  Prejudice is found where "there is a reasonable probability that, but for counsel's

10  unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A

11  reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.

12        In extraordinary cases, ineffective assistance of counsel claims are evaluated

13  based on a fundamental fairness standard.  Williams v. Taylor , 529 U.S. 362, 391-93 (2000),

14  (citing Lockhart v. Fretwell, 506 U.S. 364 (1993)).

15        The Supreme Court has emphasized the importance of giving deference

16  to trial counsel's decisions, especially in the AEDPA context:

17        In Strickland we said that "[j]udicial scrutiny of a counsel's
    performance must be highly deferential" and that "every effort

18  [must] be made to eliminate the distorting effects of hindsight, to
    reconstruct the circumstances of counsel's challenged conduct, and

19  to evaluate the conduct from counsel's perspective at the time."
    466 U.S. at 689.  Thus, even when a court is presented with an

20  ineffective-assistance claim not subject to § 2254(d)(1) deference,
    a [petitioner] must overcome the "presumption that, under the

21  circumstances, the challenged action 'might be considered sound
    trial strategy.'"  Ibid. (quoting Michel v. Louisiana, 350 U.S. 91,

22  101 (1955)).

23  For [petitioner] to succeed, however, he must do more than show
    that he would have satisfied Strickland's test if his claim were

24  being analyzed in the first instance, because under § 2254(d)(1), it
    is not enough to convince a federal habeas court that, in its

25  independent judgment, the state-court decision applied Strickland

26

9

1    incorrectly.  See Williams, supra, at 411.[2]  Rather, he must show
     that the [ ]Court of Appeals applied Strickland to the facts of his
2    case in an objectively unreasonable manner.

3    Bell v. Cone, 535 U.S. 685, 698-99 (2002).

4           *Claim One*

5           Petitioner raised claim one in a habeas corpus petition filed in the California

6    Supreme Court.  (Respondent's Exhibit 13.)  The California Supreme Court denied this petition

7    without comment or citation.  (Respondent's Exhibit 14.)  Therefore, no state court issued a

8    "reasoned decision" addressing this claim.

9           Petitioner alleges that trial counsel was ineffective by failing to adequately

10   investigate and present exculpatory evidence of causation.  Petitioner contends that had counsel

11   conducted a proper investigation, he would have discovered that the injuries inflicted by

12   petitioner were not the cause of death.  In support of this claim, petitioner cites the report of Dr.

13   Gregory Reiber attached to the petition as exhibit A.  Petitioner seeks an evidentiary hearing to

14   further develop Dr. Reiber's report.  In support of this request, petitioner refers to his own

15   declaration attached to the petition as exhibit B.  In this declaration, petitioner states that Dr.

16   Reiber prepared the report for petitioner pro bono and reviewed only partial records of the victim.

17          The undersigned first considers whether petitioner is entitled to an evidentiary

18   hearing.  Federal courts may hold evidentiary hearings in habeas actions under certain prescribed

19   conditions:

20          If the applicant has failed to develop the factual basis of a claim in state court
            proceedings, the court shall not hold an evidentiary hearing on the claim unless
21          the applicant can show that-
                   (A) the claim relies on-
22                        (i) a new rule of constitutional law ...; or
                          (ii) a factual predicate that could not have been previously
23                        discovered through the exercise of due diligence; and
            (B) the facts underlying the claim would be sufficient to establish by clear
24          and convincing evidence that but for constitutional error, no reasonable

25   _____

26          [2]  This internal citation should be corrected to Williams v. Kaiser, 323 U.S. 471, 477
     (1945).

10

1    factfinder would have found the applicant guilty of the underlying offense.

2    28 U.S.C. § 2254(e)(2).

3    Whether a petitioner failed to develop a claim in state court turns on whether the

4    petitioner exhibited a lack of diligence or some greater fault in state court.  Williams v. Taylor,

5    529 U.S. 420 (2000).  Ordinary diligence requires that petitioner seek an evidentiary hearing in

6    state court in the manner prescribed by state law.  Id. at 437.  Under California law, a court, when

7    presented with a state habeas petition, determines whether an evidentiary hearing is warranted

8    only after the parties file formal pleadings, if they are ordered to do so.  See Horton v. Mayle,

9    408 F.3d 570, 582 n. 6 (9th Cir. 2005).  If the state court denies the petition without ordering

10   formal pleadings, the case never reaches the stage where an evidentiary hearing must be

11   requested and the petitioner's failure to request a hearing in state court does not trigger

12   § 2254(e)(2).  Id.

13   The California Supreme Court denied the petition raising the instant claim without

14   ordering formal pleadings.  (See Respondent's Exhibits 13, 14.)  For that reason, petitioner did

15   not "fail to develop" the facts because he acted diligently in seeking an evidentiary hearing in

16   state court.  See Williams v. Taylor, 529 U.S. at 437.[3]

17   Accordingly, although petitioner's habeas petition is governed by AEDPA, which

18   limits a district court's discretion in conducting evidentiary hearings and discovery, see 28

19   U.S.C. § 2254(e)(2), this court assesses the availability of an evidentiary hearing under

20   pre-AEDPA law because petitioner exercised sufficient diligence in seeking to develop the

21   factual basis of his claim in state court.  Id. at 437.

22   "Under pre-AEDPA law, a habeas petition is entitled to an evidentiary hearing

23   [and discovery] on a claim where the facts are in dispute if: (1) he has alleged facts that, if proven

24   would entitle him to relief; and (2) he did not receive a full and fair evidentiary hearing in state

25   _____

26   [3]  In any event, petitioner requested an evidentiary hearing in the petition filed in the California Supreme Court raising this claim.  (Respondent's Exhibit 13.)

court." See Silva v. Calderon, 279 F.3d 825, 853 (9th Cir. 2002). "In other words, petitioner

must allege a colorable constitutional claim." Turner v. Calderon, 281 F.3d 851, 890 (9th Cir.

2002).

Nevertheless, the court does not have to hold an evidentiary hearing when the

record clearly refutes the collateral factual allegations raised by petitioner. Schriro v. Landrigan,

550 U.S. 465 (2007). Schriro also announced that in determining whether to grant an evidentiary

hearing the federal court must apply the AEDPA deferential standards to legal and factual

questions necessarily reached by the state courts. Id.

The undersigned now turns to the background of claim one. At trial, prosecution

witness Dr. Hogan testified regarding the cause of Rendleman's death. Dr. Hogan testified that

Rendleman had hemorrhaging on the right side of his brain. (RT at 48.) The hemorrhaging was

caused by blunt force trauma to his head. (RT at 70.) "Blunt force trauma means that the force

that was applied was a blunt instrument, which could be a fist, a foot, a baseball bat, a pipe,

something that doesn't have a sharp edge to it." (Id.) Dr. Hogan testified that Rendleman had

severe trauma to the left side of his face. (RT at 50.) She testified that force applied to the left

side of the face could cause injury to the right side of the face pursuant to a "well known"

phenomenon called the "contra coup" theory. (RT at 50.) Dr. Hogan testified that Rendleman's

brain injuries were consistent with having been stomped on. (RT at 52.) After being shown the

photographs of Rendleman's face containing the shoe marks, Dr. Rendleman testified that the

stomping these marks indicated could have caused Rendleman's injuries. (RT at 52.) In her

opinion, the injuries occurred while Rendleman's head was against an object, such as if his head

were on the floor. (RT at 53.)

In his report, Dr. Reiber similarly concluded that Rendleman's death was caused

by complications of "blunt head injury which resulted in a large right subdural hemorrhage and

altered mental status." However, he found that the trauma was more likely caused by blows to

the face rather than stomping. (Petition, Exhibit A.) Dr. Reiber found as follows:

> Stomp mark impression injuries on the left side of the face are consistent with the overall story that Rendleman was stomped in the head – and, given the two separate areas bearing the same imprint pattern, at least twice.  The subdural hemorrhage, however, is on the right side of the head, and there are also numerous injuries to the right facial area.  If the stomping were to be considered the primary cause of the subdural hemorrhage, one would have to invoke the "contre coup" phenomenon where the blow to the head on one side causes injury to the opposite side.  This phenomenon is considered a "moving head" injury; that is, it requires the head in motion impacting another surface which causes a sudden stop.  Stomping injuries are not consistent with this scenario as they require the head to be supported on the opposite surface so that the stomping is effective in producing injury.  Thus it is unlikely that stomping alone caused the head injury.  It is much more likely that the head injury was caused primarily by blows to the face, particularly the right side, or to Rendleman falling and striking the head after being hit, or to a combination of blows and a fall or several falls.  The stomping may have been additive, but would not be primarily causative, in my opinion.

(Petition,  Exhibit A.)

In claim one, petitioner contends that the prosecution proceeded on the theory that Rendleman's fatal hemorrhage was caused by petitioner stomping on his head as he lay on the floor.  (See RT at 370:11-17 (prosecutor's closing argument).)  Petitioner argues that had counsel consulted an independent expert, he would have learned that this theory was medically dubious.  (See argument in traverse, Dkt. No. 30, p. 3.)  Petitioner argues that Dr. Reiber found that the stomping to which Nunez testified could not have been the primary cause of Rendleman's hemorrage and cause of death.  (Id., pp. 3-4.)  Petitioner observes that Dr. Reiber disputes Dr. Hogan's explanation of the "contre coup" phenomenon.  (Id., p. 4.)  Petitioner argues that to impeach Nunez's credibility and to dispute the causal relationship between the facts related by Nunez and the forensic evidence, reasonable counsel should have sought an independent medical expert.  (Id.)

After reviewing the record, the undersigned agrees with petitioner that the prosecution proceeded on a theory that petitioner stomped Rendleman to death.  While Dr. Hogan testified that the ultimate cause of petitioner's death was injuries due to blunt force trauma (RT at 55), this opinion was based on the shoe marks found on Rendleman's face.  While Dr. Hogan testified that the blunt force trauma could have been inflicted by other sources such as

a fist or a baseball bat, the evidence that petitioner stomped on Rendleman's head was the most consistent with her testimony regarding the "contre coup" phenomenon.  In addition, as observed by petitioner, during closing argument the prosecutor argued that petitioner's stomping of Rendleman caused his death.

After reviewing the record, the undersigned finds that petitioner was not prejudiced by counsel's failure to provide his own medical expert regarding the issue of causation.  As set forth below, petitioner's version of events that Nunez inflicted the fatal injuries was neither credible nor supported by any other witness.

In his statement to the police, which was played to the jury, petitioner stated that he went to Rendleman's apartment because he wanted to give Nunez some money that he owed him.  (Respondent's Exhibit 3, pp. 5-6.)  Petitioner knocked on the door, the door got opened, he walked in, then Rendleman yelled at him to "get the fuck out of here."  (Id. at 6.)  Rendleman then threw his beer on petitioner.  (Id.)  According to petitioner, he then went into the kitchen with Nunez and asked him if he had any change because he wanted to pay him money he owed him.  (Id.)  Rendleman then came in to the kitchen and started yelling at petitioner.  (Id.)  Badial then came in to the kitchen and grabbed petitioner and spun him around.  (Id. at 7, 20.)  Petitioner then grabbed Badial around the neck and walked him away.  (Id. at 20.)  According to petitioner, Rendleman then hit him over the head with the beer bottle.  (Id.)

Petitioner claims that after being hit with the beer bottle, Nunez told him (petitioner) to leave.  (Id. at 7.)  As Nunez picked petitioner up in order to help him to leave, petitioner claims that someone hit him in the jaw.  (Id.)  Petitioner fought back then started to leave.  (Id.)  As he did, he saw Nunez stomping and beating Rendleman.  Id. at 7.  Petitioner claims that Nunez was trying to help him.  (Id. at 30.)  Petitioner stated that as he was leaving he saw Nunez "kicking him, kicking him, kicking him."  (Id. at 17.)  Petitioner also stated that when he defended himself after being hit with the beer bottle, he believes he was hitting and kicking Rendleman.  (Id. at 9.)

1    Toward the end of his statement, petitioner remembered that he hit Badial after he

2   ran after petitioner and tried to hit him as petitioner was leaving.  (Id.)  Petitioner did not hit

3   Badial when he held him by the neck.  (Id. at 54.)  Toward the end of his statement, petitioner

4   also stated that he kicked Rendleman in the chest when he was sitting on the mattress.  (Id. at

5   73.)  Petitioner denied hitting Rendleman in the face with his fist.  (Id.)  Petitioner also denied

6   kicking Rendleman in the head.  (Id.)

7    Four prosecution witnesses testified to a very different version of events.  Bridget

8   Hull, who was at Rendleman's apartment on the night of the incident, testified that petitioner

9   knocked on the door and was told by Rendleman that he could not come in.  (RT at 109.)

10   Petitioner came in anyway, pushing his way in.  (RT at 110.)  Petitioner then went to talk to

11   Nunez.  (RT at 111.)  While petitioner spoke to Nunez, Badial was clowning around behind them

12   but did not touch petitioner.  (RT at 112.)  Badial told petitioner to get out.  (RT at 113.)

13   Petitioner hit Badial then grabbed him and pushed him against a wall and "strangled" him.  (Id.)

14   Petitioner lifted Badial off the floor as he held his neck.  (RT at 116.)  Badial's face was

15   "swelling" and his eyes "popped out."  (RT at 117.)  At this time, Rendleman was sitting on the

16   bed.  (RT at 118.)  Rendleman told petitioner to stop it.  (Id.)  When petitioner did not let Badial

17   go, Rendleman got up and hit him over the head with a beer bottle.  (RT at 119.)  Hull then left.

18   (Id.)

19    Badial testified that petitioner walked into the apartment without knocking.  (RT

20   at 149.)  Badial then told him to leave.  (RT at 150.)  Badial heard petitioner saying that he was

21   there to collect $8 owed to him by Rendleman or someone else.  (RT at 153.)  Nunez handed

22   petitioner $5.  (Id.)  Petitioner said he wanted the rest of his money.  (Id.)  During this time,

23   Rendleman kept telling petitioner to leave.  (RT at 154.)  Petitioner then grabbed Badial and

24   punched him.  (RT at 156.)  After being punched and grabbed by the throat, Badial blacked out.

25   (RT at 159.)  When he came to, he saw Rendleman get up and hit petitioner on the back of the

26   head with a beer bottle.  (RT at 161.)  After being choked, Badial blacked out again.  (RT at 164.)

1   When he came to, petitioner was punching Rendleman.  (RT at 165.)  Petitioner punched

2   Rendleman in the face approximately six times.  (RT at 166.)  Badial blacked out again.  (Id.)  He

3   did not see petitioner kick Rendleman.  (Id.)

4          Nunez testified that when petitioner arrived, he just walked into the apartment.

5   (RT at 208.)  Badial then got up and told petitioner to leave.  (RT at 210.)  Petitioner responded,

6   "You don't have to talk to me that way."  (RT at 211.)  Nunez could not remember any

7   conversation with petitioner regarding money or whether he gave petitioner any money.  (RT at

8   212.)  After Badial told petitioner to leave, petitioner picked Badial up by the throat.  (RT at

9   213.)  Petitioner was "kind of" choking him.  (RT at 215.)  Petitioner then put Badial up against

10  the kitchen wall.  (Id.)  Rendleman then hit petitioner over the head with a beer bottle.  (RT at

11  218.)  Petitioner then hit Rendleman a couple of times and then he hit Badial in the mouth.  (RT

12  at 220.)  At this time, Rendleman was on the ground next to the bed.  (RT at 221.)  Petitioner

13  then kicked Rendleman several times in the head.  (RT at 220.)  The kicks were pretty hard.  (RT

14  at 222.)

15         Defense witness Simone Grimes, who was at the apartment at the time of the

16  incident, testified that petitioner "just walked into the apartment and demanded some money

17  from Mr. Rendleman."  (RT at 283.)  She testified that after petitioner assaulted Badial,

18  Rendleman hit petitioner on the head with the beer bottle.  (RT at 284.)  When petitioner had

19  Badial pinned to the wall, he punched Badial in the face.  (RT at 293.)  Petitioner appeared to be

20  choking Badial.  (Id.)

21         Had the jury heard evidence from a defense medical expert that Rendleman's

22  death was more likely caused by being beaten rather than stomped, it is extremely unlikely that

23  the outcome of the trial would have been different.  As discussed above, the jury heard

24  conflicting evidence that both petitioner and Nunez stomped and hit Rendleman.  Had the jury

25  believed petitioner's statement that he saw Nunez "kicking him, kicking him, kicking him," it

26  would have found him not guilty on grounds that Nunez inflicted the fatal stomping.  However,

1   the jury clearly disbelieved petitioner's story.  Had defense counsel presented expert medical

2   testimony that Rendleman's injuries were more likely caused by being beaten, the jury most

3   likely would not have found petitioner more credible, and Nunez less credible, as there was

4   testimony that petitioner hit Rendleman in the head several times.  The evidence that petitioner

5   caused Rendleman's injuries, rather than Nunez, was strong.

6          In the traverse, petitioner cites other evidence of blunt force trauma that his

7   counsel attempted to highlight as causes or contributors to Rendleman's death, including Nunez

8   admitting that he and Simon Grimes hit Rendleman on a previous occasion.  However, petitioner

9   has presented no evidence demonstrating that any previous injury suffered by Rendleman caused

10  his death and Dr. Reiber's report suggests no such theory.

11         Petitioner also cites the evidence of Rendleman's falls, which he argues may have

12  caused his fatal injuries.  In particular, petitioner cites the 911 call placed by Badial during which

13  he reported that Rendleman had fallen over backward, the responding officers' observation that

14  Rendleman fell over and hit his head, as well as Dr. Hogan's testimony that chronic alcoholics

15  like Rendleman may fall frequently and bleed excessively.

16         Dr. Hogan testified that Rendleman's head trauma could not have been caused by

17  him standing up and falling into a wall.  (RT at 57.)  She testified that she would not expect

18  someone who fell on the back of their head to have the right sided injuries that she observed in

19  Rendleman.  (RT at 70.)  In a situation where someone fell on the back of their head, she would

20  expect to see a skull fracture in the back and a lot of bleeding in the frontal lobe.  (Id.)  When

21  asked if Dr. Hogan saw injuries in Rendleman consistent with falling on the right side his head,

22  she answered "no."  (RT at 75.)

23         In his report, Dr. Reiber found that Rendleman's injuries may have been caused

24  by a combination of blows to the head and falling.  However, based on this testimony, the jury

25  could still have found that petitioner was the proximate cause of Rendleman's death.  See People

26  v. Gardner, 37 Cal.App.4th 473, 481, 43 Cal.Rptr.2d 603 (1995).  In other words, the jury could

1    reasonably have found that petitioner's blows caused Rendleman to fall.

2           For the reasons discussed above, the undersigned finds that petitioner was not

3    prejudiced by counsel's failure to investigate and present evidence regarding the cause of

4    Rendleman's death.  Petitioner is not entitled to an evidentiary hearing because the record clearly

5    refutes his claim.  Schriro v. Landrigan, 550 U.S. 465 (2007).  Moreover, petitioner is not

6    entitled to an evidentiary hearing because the finding by the California Supreme Court that

7    counsel did not act unreasonably by failing to adequately investigate and present exculpatory

8    evidence of causation was not an unreasonable application of clearly established Supreme Court

9    authority.  Id.  Accordingly, this claim should be denied.

10          *Claim Two*

11          Petitioner alleges that trial counsel was ineffective for failing to move for

12   bifurcation of the trial of his prior convictions.  Petitioner raised this claim in both his direct

13   appeal and habeas petitions filed in state court.  On direct appeal, the California Court of Appeal

14   issued a reasoned decision addressing this claim.  (Respondent's Exhibit 7.)  In his state habeas

15   corpus petition, petitioner attached the declaration of his trial counsel addressing this issue to

16   supplement this claim.  (Respondent's Exhibit 8 (opinion of California Court of Appeal

17   addressing habeas petition).)  In support of the instant claim, petitioner has also attached the

18   declaration of trial counsel.  (See Petition, Exhibit Dkt. No. 1, petition for writ of habeas corpus

19   filed in California Court of Appeal attached as exhibit.)

20          The California Court of Appeal in reviewing petitioner's state habeas petition was

21   the last state court to issue a reasoned opinion addressing this claim.  Accordingly, the

22   undersigned considers whether the denial of this claim by the California Court of Appeal was an

23   unreasonable application of clearly established Supreme Court authority.

24          The California Court of Appeal denied this claim for the following reasons:[4]

25   _____

26          [4] For ease of readability, case names have been underlined and parallel citations omitted.

                                              18

Failure to request bifurcation of priors

At the outset of petitioner's trial, defense trial counsel and the trial court discussed the fact that there was no request for bifurcation of the trial regarding the truth of the prior conviction allegations, because petitioner had decided to testify, and his prior convictions would be admissible for impeachment in any event.  As a result, the jury heard evidence as to the two prior robbery conviction allegations, and two other felony priors for theft, in the prosecution's case in chief.  However, after the conclusion of the prosecution evidence, petitioner did not testify.  Petitioner contends his trial counsel was prejudicially ineffective in failing to request bifurcation.

The law in this area is well settled.  A criminal defendant has a federal and state constitutional right to the effective assistance of counsel.  To establish a claim of incompetence of counsel, a defendant must establish both that counsel's representation fell below an objective standard of reasonableness and that it is reasonably probable that, but for counsel's error, the result of the proceeding would have been different.  (Strickland v. Washington (1984) 466 U.S. 668, 686-88, 694-95 (Strickland); People v. Ledesma (1987) 43 Cal.3d 171, 215-18 (Ledesma).)  To prevail, a defendant must establish incompetence of counsel by a preponderance of evidence.  (Ledesma, supra, at 218.)

Pursuant to the right to effective assistance of counsel, the defendant can expect that defense counsel will undertake actions that a reasonably competent attorney would undertake.  (Ledesma, 43 Cal.3d at 215.)  Judicial scrutiny of defense counsel's performance is however highly deferential once trial is completed.  Courts indulge in a strong presumption that trial counsel's conduct falls within the wide range of reasonable professional assistance.  (Strickland, 466 U.S. at 689.)  The defendant must overcome the presumption that under the circumstances, the challenged action might be considered a sound tactical decision.  (Ibid.)

The United States Supreme Court also observed in Strickland, supra, that tactical or strategic choices made after investigation of a case are virtually unchallengeable.  (Strickland, 466 U.S. at 690.)  Where the challenged omission may have been the result of an informed and reasonable tactical choice rather than neglect, ineffective assistance of counsel has not been shown.  (People v. Pope (1979) 23 Cal.3d 412, 424.)

As to the question of bifurcation of the trial, a trial court has discretion to grant a motion for determination of the truth of a prior conviction allegation in a separate proceeding.  (People v. Calderon (1994) 9 Cal.4th 69, 75 (Calderon ); People v. Cline (1998) 60 Cal.App.4th 1327, 1334.)  "[H]owever, bifurcation is not required in every instance.  In some cases, a trial court properly may determine, prior to trial, that a unitary trial of the defendant's guilt or innocence of the charged offense and of the truth of a prior conviction allegation will not unduly prejudice the defendant.  Perhaps the most common situation in which bifurcation of the determination of the truth of a prior conviction allegation is not required arises when, even if bifurcation were ordered, the jury still would learn of the existence of the prior conviction before returning a verdict of guilty.  For example, when the existence of the defendant's prior offense otherwise is admissible to prove the defendant committed the charged offense - because the earlier violation is an

element of the current offense (see, e.g., § 12021; People v. Valentine, (1986) 42 Cal.3d 170, 179, fn. 3), or is relevant to prove matters such as the defendant's identity, intent, or plan (see, e.g., People v. Ewoldt (1994) 7 Cal.4th 380; People v. Balcom (1994) 7 Cal.4th 414) - admission of the prior conviction to prove, as well, the sentence enhancement allegation would not unduly prejudice the defendant.  Similarly, when it is clear prior to trial that the defendant will testify and be impeached with evidence of the prior conviction (see People v. Castro (1985) 38 Cal.3d 301 [, 316]), denial of a request for a bifurcated trial generally would not expose the jury to any additional prejudicial evidence concerning the defendant.  Under such circumstances, a trial court would not abuse its discretion in denying a defendant's motion for bifurcation." (Calderon, supra, at 78 (fns. and italics omitted).)

Petitioner contends his trial counsel's failure to seek bifurcation shows prejudicial ineffectiveness.  Petitioner especially contends his counsel should have used the conditional motion to bifurcate procedure.  According to petitioner, defense counsel should have sought bifurcation conditionally, forcing the trial court to rule that the matter would be bifurcated in the event that petitioner did not testify, and defense counsel could have reconsidered this procedure if petitioner elected to testify.  Such a strategy would have resulted in a separate bifurcated trial of the priors, if the jury convicted petitioner of a felony as to the present charges, and would have avoided introduction of evidence as to the priors in the trial of the present charges.

In support of his habeas petition, petitioner has filed his own declaration, and that of his defense counsel in the trial court, Carl D. Spieckerman.  In petitioner's own declaration, he states that he discussed with his counsel the subject of whether he would take the stand and testify.  Petitioner initially did not want to take the stand.  However, "[a]t the time of trial, I thought that I might testify, but I had not fully made up my mind to do so."  He recalls that his counsel told the trial judge on the first day of trial, "Mr. Winn has anticipated he would testify."  This was not a firm commitment, but merely "alerted the judge" to this fact.  Later, he discussed this question again with counsel, and decided not to testify.  Petitioner never made a decision to allow his priors to go before the jury.

In the declaration of petitioner's defense attorney, counsel states that he had discussed with petitioner whether he should testify, and that "[b]y the time the trial started, petitioner had agreed that his testimony was important and we both agreed that he would probably testify."  Later, at a hearing on the defense motion to limit impeachment evidence, counsel requested that the court limit impeachment of petitioner to the priors that were alleged in the charging documents: "Mr. Winn has anticipated he would testify.  And I would ask that any impeachment regarding the felonies just be the ones that are alleged in the charging documents ...."  Counsel made these comments because "[p]etitioner had made up his mind that he wanted to testify."

If petitioner testified, his prior convictions could be used to impeach him, and there was no purpose in moving to bifurcate the priors, which was the "normal practice" for defense counsel in a case where the defendant did not testify.  Later, however, after the prosecution played the videotape for the jury in which petitioner provided his side of the story, counsel advised petitioner not to testify,

and petitioner decided he would not testify.

Defense counsel also states that "[a]s I look back on the situation and reread the transcript, I remember thinking that since it seemed petitioner might testify, the prior convictions would get before the jury through impeachment, and so there was no need to make a motion to bifurcate."  However, counsel now states: "In hindsight, it does not seem reasonable to have not made a motion to bifurcate the proceedings."

The Attorney General has filed a return to the petition, and has included a declaration from the deputy district attorney who tried the case for the prosecution, George Williamson.  The prosecutor confirms that no motion to bifurcate was made, and that the prosecutor did not question this tactic, because it was understood that petitioner would testify and would therefore be subject to impeachment with his prior convictions: "I have tried many cases in which a defendant was planning to testify and defense counsel therefore made the tactical decision not to bifurcate the proceedings on the prior convictions.  In fact, it is common practice for defense counsel not to move for bifurcation when his or her client will be taking the stand and would be subject to impeachment with the prior convictions."

The prosecutor also identified two valid tactical reasons for defense counsel's decision not to seek bifurcation: "In my experience, defense counsel often elect not to seek bifurcation of prior conviction proceedings when their client is planning on testifying for two obvious tactical reasons: (1) allowing the jury to learn about the prior convictions before a defendant testifies tends to have less sting or impact than allowing the jury to learn about the priors for the first time during cross-examination of the defendant; and/or (2) informing the jury about the prior convictions in a 'three strikes' case may raise sympathy for the defendant from the jury so that they might convict on a lesser included crime or acquit the defendant altogether rather than send him to prison for the rest of his life."

According to petitioner, however, his attorney should have at least sought bifurcation conditionally, forcing the trial court to rule that the allegations charging prior convictions would be bifurcated in the event that petitioner did not testify.  In this manner, defense counsel could have reconsidered this procedure should petitioner elect to testify.  As events transpired, the conditional bifurcation of these allegations would have avoided the introduction of evidence of petitioner's prior felony convictions at the trial of the underlying charges.

It therefore falls to this court to determine whether the failure of defense counsel to move to bifurcate, as a tactical decision made at the time when it was believed petitioner would testify, constituted ineffective assistance, and resulted in prejudice.  (See Strickland, 466 U.S. at 689-90.)  It is true that petitioner later decided not to testify, and as defense counsel now concedes, another course of action such as a conditional motion to bifurcate would have been better.  This concession is not necessarily determinative, and our own Supreme Court has observed, "Self-proclaimed inadequacies on the part of trial counsel in aid of a client on appeal are not persuasive." (People v. Beagle (1972) 6 Cal.3d 441, 457.)  However, for purposes of this opinion we will take trial counsel at his word, and conclude he rendered ineffective assistance.

21

1   However, there remains the issue of a showing of prejudice from the failure to
    make a motion to bifurcate.  We first note that evidence of petitioner's culpability
2   was overwhelming.  Numerous witnesses placed him in the victims' apartment,
    while strangling, beating, and kicking the victims.  Although petitioner initially
3   sought to deny responsibility for the attack, and he tried to place the blame on
    others, his own statements to the police ultimately implicated him in beating and
4   kicking Rendleman, as did all the other evidence.  Even the testimony of
    petitioner's longtime friend Crawford, to the effect that she broke up the fight
5   between petitioner and Rendleman, was not helpful or persuasive in light of
    petitioner's admissions.  Crawford's testimony confirmed that it was petitioner, not
6   someone else, who was hostile to Rendleman, had a motive to attack him, and had
    been fighting in his apartment.  Further, neither Badial nor Nunez had cuts on
7   their hands or blood on their clothes, and their shoes did not match the pattern of
    the facial injury to the victim.

8
    Petitioner also tried to suggest a self-defense theory, but he presented no
9   testimony showing self-defense.  All witnesses to the fighting agreed that it was
    petitioner who first resorted to violence, and the medical evidence showed the
10  fatal injuries suffered by Rendleman could not have been inflicted in self-defense,
    since they consisted of repeated stomping of the victim's head, when he would
11  have already been lying helpless on the floor.

12  In light of this record we cannot conclude petitioner would have achieved a better
    outcome at trial if the prior convictions had been bifurcated, and therefore we
13  cannot find prejudicial incompetence of counsel.  (See Strickland, 466 U.S. at
    694-95; see also People v. Montiel (1993) 5 Cal.4th 877, 921; People v. Bell
14  (1989) 49 Cal.3d 502, 546; People v. Hernandez (1988) 47 Cal.3d 315, 371.)

15  (Respondent's Exhibit 8, pp. 8-13.)

16        The undersigned has reviewed the declarations of petitioner and trial counsel

17  attached to petitioner's state habeas petition.  (See Petition, Dkt. No. 1, petition filed in

18  California Court of Appeal attached as exhibit.)  From these declarations, it appears that at the

19  beginning of trial both petitioner and trial counsel agreed that it was likely that petitioner would

20  testify, although not certain.  The California Court of Appeal found that under these

21  circumstances, trial counsel did not act unreasonably by failing to move to bifurcate the trial of

22  petitioner's prior convictions.  The undersigned need not reach this issue because it is clear, for

23  the reasons stated by the California Court of Appeal, that petitioner was not prejudiced by

24  counsel's alleged unreasonableness.

25        Had the jury been unaware of petitioner's prior convictions, it is unlikely that the

26  outcome of the verdict would have been different because the evidence against petitioner was

strong. As discussed in the section above, no witness supported petitioner's version of events. Rather, the combined testimony of the four witnesses described above supported the prosecution's version of events. For these reasons, petitioner was not prejudiced by counsel's failure to move to bifurcate the trial for his prior convictions.

The denial of this claim by the California Court of Appeal was not an unreasonable application of clearly established Supreme Court authority. Accordingly, this claim should be denied.

*Claim Three*

Petitioner alleges that trial counsel was ineffective for failing to object to alleged prosecutorial misconduct during closing argument.

In opinions issued on May 24, 2002, the California Court of Appeal issued reasoned opinions addressing this claim in orders upholding petitioner's conviction on direct appeal and denying petitioner's state habeas petition. (Respondent's Exhibit's 7 and 8.) These are the only reasoned decisions by a state court addressing this claim. The declaration of trial counsel submitted in support of the state habeas petition addresses this claim. (See Dkt. No. 1, petition, brief in support of state habeas petition.) Accordingly, the undersigned will review the denial of this claim by the California Court of Appeal in its order addressing the state habeas petition.

The California Court of Appeal denied this claim for the following reasons:

1. No Objection to Claimed Griffin Error.

Petitioner also claims defense counsel was ineffective for not objecting to alleged Griffin error by the prosecutor, who observed that petitioner was not testifying under oath when he spoke to the police. (See Griffin v. California, 380 U.S. 609, 614 (1965).

The following closing argument was made by petitioner's trial counsel: "I also told you that I thought Ronnie would get up and testify. As the case develops, you see the tape; you see the evidence that's come in." After the trial court overruled the prosecutor's objection, that defense counsel was "drawing an inference and he's arguing whether or not he's going to testify or---," defense counsel continued: "So I'm not saying you should draw any inference. I'm just telling you that I'm

23

apologizing because I did tell you that I thought Ronnie would testify.  That's all I was trying to say at that point.  [¶] I do feel that there was no need for him to do that, and the jury instructions will tell you that he doesn't have to get up; he can't talk.  You can't draw any adverse inference from that.  You can't draw any adverse inference from it at all, and there's a couple of jury instructions you'll see outlines that, and how you should handle the thing about that." (FN5).

> FN5.  Although defense counsel, in his opening statement to the jury, had not explicitly informed the jury in so many words that petitioner would testify, the prosecution's opening statement had pointed out that "if the defendant testifies, you'll be able to assess his testimony the same way [as any other witness]."  Defense counsel had also promised, "you'll hear evidence, which if you believe, you'll find Mr. Winn not guilty.  So please keep an open mind."

Somewhat later in his closing argument, defense counsel stated: "This is a case that from the very first we put everything on the line in front of you.  You got to hear about Mr. Winn's prior convictions; convictions of felony.  He's been to prison.  He's put that right out, out on the table for you.  [¶] No one has gotten up and said that he didn't.  I mean, that's going to be easy for you.  If you find him guilty of one of these felonies, which, you know, I can't see how you would, but that's your prerogative, then you go to these things.  We never said these things didn't happen because they did; because they did."

The prosecutor's final summation then addressed petitioner's failure to testify, and his statement to the police: "Well, when he argued this to you, he made it sound like this guy testified.  He told you that, he referred to that several times in his statement.  We know Mr. Winn didn't testify.  Okay.  And you know under the law you are to draw no adverse inferences from the fact he didn't testify.... That's the choice he made, he didn't want to fight the evidence.  You are to draw no inference from that.  Let's face it, he didn't testify in front of you.  [¶] The other thin[g] we know about the statement of June 21st[,] that wasn't under oath.  That wasn't subject to hard cross-examination like you folks know can be to test it."  There was no objection to these comments.

Thus, the defense in closing argument first brought up the fact that petitioner did not testify, and defense counsel argued that petitioner did not testify because his statements to the police, placed in evidence by the prosecution, had already told his side of the story.  The prosecutor then echoed the defense observation that petitioner did not testify, and that no adverse inference could be drawn from this.  The prosecutor added the rebuttal observation that petitioner was not testifying under oath and subject to cross-examination in his statements to the police.

We read these statements to be permissible comments by the prosecutor on the state of the evidence.  (People v. Bradford (1997) 15 Cal.4th 1229, 1339-40.)  This was not Griffin error.  (See People v. Mincey (1992) 2 Cal.4th 408, 446.)  In addition, the jury was instructed not to draw any adverse inferences from petitioner's failure to testify, and no particular inappropriate prejudice appears from these statements by the prosecutor.  (Ibid.) Defense counsel was not required to make a futile objection to these comments, and no ineffectiveness or prejudice is shown.  (See Strickland, 466 U.S. at 694-95.)

1  (Respondent's Exhibit 8, pp. 13-15.)

2          In the traverse, petitioner also cites another portion of the prosecutor's closing

3  argument as alleged <u>Griffin</u> error:

> The reason why he can concoct that lie, remember he was basically at large for
> over three weeks behind the case.  He had plenty of time to make this story to sell
> to Detective Thelen.  He had plenty of time to talk to Linda Crawford about trying
> to corroborate about seeing him and Ed stomping the victim.  You saw how
> credible he is.  *That is the reason God made cross-examination so you can test the
> truth of things.*

8  (RT at 421 (emphasis added).)

9          Comment on the refusal to testify at trial violates a defendant's Fifth Amendment

10  right against self-incrimination.  <u>Griffin v. California</u>, 380 U.S. 609, 615 (1965) (holding "that

11  the Fifth Amendment ... forbids either comment by the prosecution on the accused's silence or

12  instructions by the court that such silence is evidence of guilt.").  The Supreme Court, however,

13  concluded that <u>Griffin</u> error did not mandate automatic reversal if it was harmless.  <u>Chapman v.

14  California</u>, 386 U.S. 18, 22 (1967); <u>see</u> <u>also</u> <u>United States v. Hasting</u>, 461 U.S. 499, 509 (1983)

15  (holding that <u>Chapman</u> mandates harmless error analysis of <u>Griffin</u> error).  In <u>Brecht v.

16  Abrahamson</u>, the Supreme Court held that constitutional error is harmless unless it "'had

17  substantial and injurious effect or influence in determining the jury's verdict.'"  <u>Brecht v.

18  Abrahamson</u>, 507 U.S. 629, 622 (1993) (quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 776

19  (1946)).

20          The Supreme Court concluded in <u>United States v. Robinson</u>, 485 U.S. 25, 32

21  (1988), that, "where ... the prosecutor's reference to the defendant's opportunity to testify is a fair

22  response to a claim made by defendant or his counsel, we think there is no violation of the

23  privilege."  In <u>Robinson</u>, the defendant's trial counsel "charged that the Government had unfairly

24  denied respondent the opportunity to explain his actions" several times, and "concluded by

25  informing the jury that respondent was not required to testify, and that although it would be

26  natural to draw an adverse inference from respondent's failure to take the stand, the jury could

not and should not do so." Id. at 27-28.  The prosecutor then commented on the defendant's prior

statements to investigators before saying, "[h]e could have taken the stand and explained it to

you, anything he wanted to.  The United States of America has given him, throughout, the

opportunity to explain." Id. at 28.  The Supreme Court held "that the prosecutor's statement that

respondent could have explained to the jury his story did not in the light of the comments by

defense counsel infringe upon [the defendant]'s Fifth Amendment rights." Id. at 31.

The California Court of Appeal found that counsel did not act unreasonably by

failing to object to the prosecutor's at-issue argument because it did not constitute Griffin error.

This finding was not an unreasonable application of Supreme Court authority.  The only

argument that came close to Griffin error was the prosecutor's comment that petitioner did not

"want to fight the evidence."  This comment was arguably not a fair response to defense

counsel's argument.  However, assuming counsel should have objected to this argument or the

other arguments, petitioner was not prejudiced because, for the reasons discussed above, the

evidence against him was strong.  The outcome of the trial would not have been different had

defense counsel objected to the alleged Griffin error.

The undersigned finds that the portion of the prosecutor's closing argument

mentioned in the traverse but not by the California Court of Appeal was not Griffin error.  The

argument that "that is the reason God made cross-examination so you can test the truth of things"

was made in reference to petitioner's statement to Detective Thelen.  In the context this argument

was made, it did not suggest that petitioner's failure to testify prohibited cross-examination of

him.

Because the denial of this claim by the California Court of Appeal was not an

unreasonable application of clearly established Supreme Court authority, this claim should be

denied.

*Claim Four*

Petitioner alleges that trial counsel was ineffective for failing to call three defense

witnesses whose testimony would have been exculpatory.  On March 25, 2005, petitioner filed a

motion to expand the record to include declarations from two of these witnesses, Jay King and

Jackie Reynolds.   (Dkt. No. 29.)  In their declarations, Mr. King and Ms. Reynolds discussed

what they would have testified to had they been called as witnesses at trial.  Petitioner also

sought to expand the record with the declaration of Henry Hawkins, an investigator for

petitioner's counsel.  In his declaration, Mr. Hawkins stated that he interviewed Linda Mitchell,

the third witness petitioner alleges counsel was ineffective for failing to call at trial.  In his

declaration, Mr. Hawkins states that Ms. Mitchell is now deceased.  He describes what Ms.

Mitchell told him she would have testified to had she been called as a witness.

On May 11, 2005, Magistrate Judge Nowinski denied petitioner's motion to

expand the record as moot.  Magistrate Judge Nowinski noted that in trial counsel's declaration

submitted in support of petitioner's state habeas petition and the instant petition, trial counsel

described the proposed testimony of King, Reynolds and Mitchell.  Because respondent and

petitioner agree as to the substance of the proposed testimony of these witnesses, as set forth in

counsel's declaration, Magistrate Judge Nowinski denied petitioner's motion to expand the

record as moot.  In essence, the motion was unnecessary as the record contained the same

information elsewhere.

The California Court of Appeal denied the instant claim for the following reasons:

> Finally, petitioner claims his trial counsel was ineffective in deciding not to present three potential witnesses in his defense: Jay King, Linda Mitchell, and Jackie Reynolds.  Defense counsel subpoenaed each of these persons at trial, and he determined what their testimony would show.  Ultimately, he decided not to call them to the stand.
>
> a. Jay King
>
> According to petitioner's trial counsel, he declined to call Jay King as a defense witness because his testimony had little probative value.  King, who was an inmate in the Solano County jail, presumably would have testified that he entered the victims' apartment, shortly before the fight which led to Rendleman's death, to collect some money; that Rendleman was drunk and belligerent; but that King and Rendleman did not get into a fight.  Later, while outside the apartment building with Linda Crawford, he heard petitioner yelling for help.  King advised Crawford

not to go up to the apartment to assist petitioner.  King was also prepared to testify that Jay Badial, the victim of the misdemeanor battery, had previously bought and used crack cocaine.

Because King's testimony would have limited relevance or value, especially in light of his criminal record and the fact that the majority of facts King would have testified to were already introduced through other witnesses, counsel elected not to call this witness.

b. Linda Mitchell

Linda Mitchell's testimony was similarly considered of marginal value by petitioner's trial counsel.  Mitchell stated she was downstairs in her apartment with Crawford when she heard a disturbance in the upstairs apartment; and that Crawford went upstairs after she heard petitioner calling for help.  Mitchell then witnessed Crawford helping petitioner down the stairs; he appeared to be injured.  After Crawford and petitioner left, the sounds of arguing, yelling and fighting continued from upstairs.  Further, Mitchell had noticed there was constant fighting and yelling at the upstairs apartment where Rendleman lived, and she was unaware of any prior occasion in which petitioner had been involved in the fighting.

According to the declaration filed by trial counsel, Mitchell's criminal record, and the introduction of major parts of her statement through the testimony of other witnesses, caused him to believe that Mitchell's testimony had limited value and would not benefit his client.

c. Jackie Reynolds

From trial counsel's interview of Reynolds, also an inmate in the Solano County Jail, it was learned he was present at the apartment complex a few days before the fight, and Reynolds saw petitioner give assistance to Rendleman after the latter was beaten up on that occasion by his drinking buddies.  On another occasion, Reynolds had seen Nunez kick and strike Rendleman.  Reynolds also overheard Nunez talking about "whipping that guy's ass again."  About three weeks before the incident in question, Reynolds saw Nunez wearing tennis shoes.

Petitioner's trial attorney declared that Reynolds required prompting, and that his story was inconsistent as to when the events took place.  Due to these errors in recollection, he made the tactical decision not to call this witness.

d. Conclusion as to the Three Potential Witnesses

As our Supreme Court has observed, the decision as to whether to call certain witnesses is a matter of trial tactics. Counsel's tactical decision not to call a witness, after investigation of the substance of his or her testimony, does not normally show ineffectiveness.  "Whether to call certain witnesses is ... a matter of trial tactics, unless the decision results from unreasonable failure to investigate."  (People v. Bolin (1998) 18 Cal.4th 297, 334.)

Here, defense counsel did investigate the potential testimony of each of these

28

witnesses, and he determined their testimony was of little value or no value to the defense, particularly in light of the witnesses' criminal history.  We find insufficient grounds to fault counsel's tactical judgment on this score.

We also reject petitioner's suggestion that his attorney was required to call these witnesses, simply because petitioner wanted these witnesses to testify and he believed their testimony would be helpful.  It was for counsel, not petitioner, to investigate the testimony of these potential witnesses and determine whether they should testify.  (See People v. Freeman (1994) 8 Cal.4th 450, 485 [recognizing that trial counsel is " 'captain of the ship' " and is in charge of such tactical decisions].)

We find no ineffectiveness or prejudice from the decision not to call these three persons as witnesses at trial.  (See Strickland, 466 U.S. at 694-95.)

(Respondent's Exhibit 8, pp. 15-17.)

In the traverse, petitioner argues that Jay King would have impeached the reliability of other witnesses regarding the events.  (Dkt. No. 30, p. 23.)  Although it is possible that the witnesses may have been confused regarding whether petitioner went to collect a debt or not, in his statement to the police petitioner admitted that he was present at the apartment on the night of the incident.  In addition, petitioner admitted that he was involved in a fight with Rendleman, although he claimed that Nunez inflicted the fatal blows.  King's testimony would not have significantly undermined the credibility of the prosecution witnesses.

Petitioner also argues that King would have helped his case by testifying that he heard petitioner scream for help after he was hit with the bottle and that petitioner was wearing dress shoes, which would not have matched the waffle print imprint on Rendleman's face. Counsel was not unreasonable in deciding that King's testimony regarding these matters would most likely not have been believed by the jury due to his criminal record.  Considering the strong evidence against petitioner, it is not likely that the jury would have reached a different result had it heard testimony from this witness.

Regarding Jackie Reynolds, counsel was not unreasonable in deciding not to call him as a witness.  In his declaration, counsel stated that he did not call him because "his story was not consistent; he had the days wrong until he was prompted and I did not believe his

1   testimony would be of much value due to these errors in recollection." (Dkt. No. 1, Petition,

2   Exhibit E (counsel's declaration attached as exhibit).)  Counsel's tactical reasons for not calling

3   Reynolds were reasonable.  In addition, while Reynolds would have testified regarding a

4   previous threat by Nunez to hurt Rendleman, Nunez himself testified regarding a previous

5   incident in which he hit Rendleman.  (RT 275-76.)

6         Petitioner's counsel also made a tactical decision not to call Linda Mitchell as a

7   witness.  In his declaration, counsel stated that he did not call her as a witness because of her

8   criminal record and because much of her statement came in through other witnesses.  (Dkt. No.

9   1, Petition, Exhibit E (counsel's declaration attached).)  Petitioner argues that Mitchell's

10  testimony would have supported defense witness Linda Crawford's testimony.  Mitchell would

11  have testified that she heard fighting going on in the apartment after petitioner had left.

12  Crawford testified that she went into the apartment after she heard petitioner screaming for help.

13  (RT at 303.)  She testified that when she entered the apartment, she saw Rendleman standing in a

14  fighting position with clenched fists.  (RT at 304.)  She and petitioner then left.  (RT at 305.)

15        The first time police tried to talk to her after the incident, Crawford told them she

16  was unavailable due to illness.  (RT at 305-06.)  When the police successfully interviewed her,

17  they searched her house in an attempt to find the clothes petitioner had been wearing on the night

18  of the incident.  (RT at 307.)  Crawford testified that on that night, petitioner was wearing dress

19  shoes and dress slacks.  (RT at 309.)  She told the police that she gave the clothes that petitioner

20  had been wearing on the night of the incident to an investigator who came to her house.  (RT at

21  313-14.)  She did not know the investigator's name.  (RT at 313.)  Crawford's testimony that she

22  gave the clothes to an investigator who she could not identify, who apparently did not resurface

23  in the case, was not particularly believable and undermined the credibility of her entire

24  testimony.

25        Mitchell's testimony would not have successfully bolstered the testimony of

26  Crawford.  Accordingly, petitioner was not prejudiced by counsel's failure to call Mitchell as a

1  witness.

2       The denial of this claim by the California Court of Appeal was not an

3  unreasonable application of clearly established Supreme Court authority.  Accordingly, this claim

4  should be denied.

5       B.  Jury Instruction Error (Claims 5-8)

6       *Legal Standard*

7       A challenge to jury instructions does not generally state a federal constitutional

8  claim.  See Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983); see also Middleton v.

9  Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985).  Habeas corpus relief is unavailable for alleged error

10 in the interpretation or application of state law.  Estelle v. McGuire, 502 U.S. 62 (1981); see also

11 Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378, 1381

12 (9th Cir. 1986).  The standard of review for a federal habeas court "is limited to deciding whether

13 a conviction violated the Constitution, laws, or treaties of the United States (citations omitted)."

14 Estelle v. McGuire, 502 U.S. at 68.  In order for error in the state trial proceedings to reach the

15 level of a due process violation, the error had to be one involving "fundamental fairness."  Id. at

16 73.  The Supreme Court has defined the category of infractions that violate fundamental fairness

17 very narrowly.  Id.

18       When what is at issue is the failure to give an instruction, petitioner's burden is

19 "especially heavy" because it has been held that "[a]n omission or an incomplete instruction is

20 less likely to be prejudicial than a misstatement of the law."  Henderson v. Kibbe, 431 U.S. 145,

21 155  (1977).  Moreover, a trial judge need not instruct on a defense which would be inconsistent

22 with petitioner's theory of the case.  Bashor v. Risley, 730 F.2d 1228, 1240 (9th Cir. 1984).

23 Failure to give a jury instruction under these circumstances will not amount to a due process

24 violation.  Id.

25       The burden upon petitioner is greater yet in a situation where he claims that the

26 trial court did not give an instruction sua sponte.  To the extent that petitioner rests his claim on a

1  duty to give an instruction sua sponte under rules of state law, petitioner has stated no federal

2  claim.  Indeed, in the failure to give a lesser included offense instruction context, the Ninth

3  Circuit has held in non-capital cases that the failure to give the instruction states no federal claim

4  whatsoever.  James v. Reece, 546 F.2d 325, 327 (9th Cir. 1976).  Therefore, in order to violate

5  due process, the impact on the proceeding from failure to give an instruction sua sponte must be

6  of a very substantial magnitude.

7          Furthermore, the Supreme Court has held that there is no unreasonable application

8  of federal law where a state appellate court decided that a jury instruction's single incorrect

9  statement of the "imperfect self-defense" standard did not render the instruction reasonably likely

10  to have misled the jury.  Middleton v. McNeil, 541 U.S. 433 (2004).

11          *Claim Five*

12          Petitioner alleges that the trial court erred by failing to properly instruct the jury as

13  to third party culpability.  The California Court of Appeal denied this claim for the following

14  reasons:

15          Next, appellant contends the trial court was required to instruct sua sponte on the
        subject of possible third party culpability for Rendleman's death.  Appellant now
16          claims such an instruction should have been given sua sponte by the trial court,
        based on appellant's tenuous claim that Rendleman might have been attacked by
17          his own friends Badial or Nunez.  Appellant also contends such an instruction was
        necessary in order to "relate[ ] this theory of the defense to the burden of proof."
18
        In criminal cases, "even in the absence of a request, the trial court must instruct on
19          the general principles of law relevant to the issues raised by the evidence."
        (People v. Wickersham (1982) 32 Cal.3d 307, 323 (internal quotation marks
20          omitted); § 1093, subd. (f).)  That duty includes an obligation to instruct on
        defenses upon which the defense relies that are raised by substantial evidence, and
21          the relationship of those defenses to the elements of the charged offense.  (People
        v. Freeman (1978) 22 Cal.3d 434, 437.)
22
        There is no California case law requiring instruction sua sponte on the subject of
23          possible third party culpability, and there is no standard instruction available for
        sua sponte use on this subject by trial courts.  Nor does appellant in his opening
24          appellate brief cite any specific language that he contends the trial court should
        have given to the jury on this issue.  Also, our Supreme Court has identified such
25          an instruction on third party culpability as a so-called "pinpoint instruction."
        (People v. Earp (1999) 20 Cal.4th 826, 886-87 (Earp).)  Pinpoint instructions are
26          not included in a trial court's sua sponte duties of instruction, but must be

1    specifically requested.  (See, e.g., People v. Mayfield (1997) 14 Cal.4th 668, 778.)

2    In addition, there was no substantial evidence that Rendleman died as a result of
     injuries inflicted upon him by any person other than appellant.  The mere fact that
3    the injured Rendleman was left with his friends Nunez and Badial for a brief
     period, after appellant departed and before the police arrived, does not constitute
4    substantial evidence that Nunez or Badial then attacked Rendleman.

5    And finally, the absence of the instruction would not in any event be prejudicial.
     In reviewing a claim of instructional error, we must consider the instructions as a
6    whole, and view them in the context presented to the jury.  (People v. Tatman
     (1993) 20 Cal.App.4th 1, 10.)  We must assume that jurors are intelligent people
7    capable of understanding and correlating all of the instructions given. (Id. at 11.)
     An erroneous instruction or failure to instruct requires reversal only if we
8    determine there is a reasonable likelihood the jury understood and applied the
     instructions given in a manner that violates the federal Constitution.  (People v.
9    Frye (1998) 18 Cal.4th 894, 957.)  The trial court instructed the jury with CALJIC
     No. 2.90 that the prosecution was required to prove appellant's guilt in the killing
10   beyond a reasonable doubt.  There was no need to more closely "relate[ ] this
     theory of the defense to the burden of proof."  Nor was there any substantial
11   evidence from which a reasonable juror could conclude that Rendleman was
     attacked by anyone other than appellant.  Any possible error in not instructing on
12   third party culpability in these circumstances would therefore be harmless.  (See
     Earp, 20 Cal.4th at 887.)

13

14   (Respondent's Exhibit 7, pp. 13-14.)

15          For the reasons stated by the California Court of Appeal, the trial court's failure to

16   sua sponte read a third-party culpability jury instruction did not violate fundamental fairness.  In

17   addition, the trial court read CALJIC No. 2.90 which instructed that the prosecutor bore the

18   burden of proving petitioner's guilt beyond a reasonable doubt.  (See Exhibit 1, Clerk's

19   Transcript on Appeal, pp. 87-147 (jury instructions).)  The jury also knew from petitioner's

20   statement that he blamed Nunez for the injuries to Rendleman.  In his closing argument, counsel

21   argued that Nunez was not truthful when he blamed petitioner for the injuries to Rendleman.

22   (RT at 398, 403.)  For these reasons, the jury did not require a third party culpability instruction

23   to find petitioner guilty.  Had the instruction been given, the outcome of the trial would not have

24   been different.

25          Because the denial of this claim was not an unreasonable application of clearly

26   established Supreme Court authority, the claim should be denied.

1          *Claim Six*

2                  Petitioner contends that the trial court failed to properly instruct the jury regarding

3   causation.  The California Court of Appeal denied this claim for the following reasons:

4              Appellant contends it was error to refuse his request for pinpoint instructions on
           causation (FN9).  He contends such instructions were necessary because
5              Rendleman might have died as a result of cirrhosis of the liver, or a fall after he
           was beaten, or an attack by another person.

6
                   FN9.  Appellant requested a version of CALJIC No. 8.55, modified to
7                  state: "To constitute murder there must be, in addition to the death of a
                   human being, an unlawful act which was a cause of that death." He sought
8                  a version of CALJIC No. 3.40, modified to state: "To constitute the crime
                   of Murder there must be in addition to the death of a human being an
9                  unlawful act which was a cause of that death.  [¶] The criminal law has its
                   own particular way of defining cause.  A cause of the death of a human
10                 being is an act that sets in motion a chain of events that produces as a
                   direct, natural and probable consequence of the act the death of a human
11                 being and without which the death would not occur."  Finally, appellant
                   requested a version of CALJIC No. 3.41, modified to state in part: "There
12                 may be more than one cause of the death of a human being.  When the
                   conduct of two or more persons contributes concurrently as a cause of
13                 death, the conduct of each is a cause of the death if that conduct was also a
                   substantial factor contributing to the result...."

14
           We again point out that pinpoint instructions on a theory need not be given, unless
15             there is substantial evidence to support the theory.  (See People v. Saille (1991) 54
           Cal.3d 1103, 1119 (Saille).)  Here, there was no need for such instructions on
16             causation, because there was no substantial evidence that the victim's death
           resulted from anything other than being beaten, kicked, and stomped in the head
17             by appellant.  The medical evidence showed the cause of death could not have
           been cirrhosis, and that the brain injuries suffered by Rendleman were caused by
18             the same blows and kicks that left the pattern of the sole of a shoe on his face.
           Cirrhosis of the liver or a simple fall would not have such effects.

19
           For the same reasons, any claimed error in this respect would be harmless, since
20             there was no evidence from which any reasonable juror could have concluded that
           the cause of the victim's death was anything other than the injuries he received in
21             the attack by appellant.  (See People v. Flood (1998) 18 Cal.4th 470, 487-90.)

22  (Respondent's Exhibit 7, pp. 15-17.)

23                 In the traverse, petitioner argues that there was ample evidence that Rendleman

24  suffered numerous injuries with numerous causes.  Petitioner cites Winn's statement to the police

25  that Nunez and Grimes had assaulted Rendleman shortly before the date of the incident, which

26  Nunez admitted.  Petitioner also cites Badial's statement to the 911 operator that Rendleman had

1  fallen more than once and that responding officers saw him fall and hit his head.  Petitioner also

2  argues that the autopsy showed multiple injuries which could have been sustained at different

3  times.

4       Petitioner's arguments are not supported by the testimony of Dr. Hogan who, as

5  discussed above, testified that petitioner's injuries were caused by blunt force trauma, consistent

6  with being stomped on, on May 28, 1999.  When asked regarding marks on Rendleman's

7  abdomen, injuries which had apparently been inflicted at an earlier time, Dr. Rendlemen testified

8  that these injuries were not acute.  (RT at 55-56.)

9       As set forth above, Dr. Hogan testified that  Rendleman's head trauma could not

10  have been caused by him standing up and falling into a wall.  (RT at 57.)  She testified that she

11  would not expect someone who fell on the back of their head to have the right sided injuries that

12  she observed in Rendleman.  (RT at 70.)  In a situation where someone fell on the back of their

13  head, she would expect to see a skull fracture in the back and a lot of bleeding in the frontal lobe.

14  (Id.)  When asked if Dr. Hogan saw injuries in Rendleman consistent with falling on the right

15  side his head, she answered "no."  (RT at 75.)

16       For the reasons stated by the California Court of Appeal, the undersigned finds

17  that the trial court's refusal to give petitioner's requested pinpoint instructions regarding

18  causation did not violate fundamental fairness.  As indicated above, there was no evidence from

19  which a reasonable juror could have concluded that the cause of the victim's death was other

20  than the injuries he received in the attack on May 28, 1999.

21       Because the denial of this claim was not an unreasonable application of clearly

22  established Supreme Court authority, this claim should be denied.

23       *Claim Seven*

24       Petitioner argues that the trial court failed to properly instruct the jury regarding

25  self-defense.  The California Court of Appeal denied this claim for the following reasons:

26       Appellant also claims the trial court should have modified, in various ways, the

numerous standard instructions on self-defense which were given to the jury, in order to further clarify the burden of proof as to self-defense.  These contentions lack merit.

Jurors were given the standard instruction, CALJIC No. 5.15:  "Upon a trial of a charge of murder, a killing is lawful, if it was justifiable or excusable.  The burden is on the prosecution to prove beyond a reasonable doubt that the homicide was unlawful, that is[,] not justifiable nor excusable.  If you have a reasonable doubt that the homicide was unlawful, you must find the defendant not guilty."  Appellant requested that the following language be added to CALJIC No. 5.15:  "It is not necessary for the defendant to establish self-defense [by evidence] sufficient to satisfy the jury that the self-defense was true, but if the evidence is sufficient to raise a reasonable doubt as to whether the defendant was justified, then he is entitled to an acquittal."

The court also gave other pertinent instruction on this issue, which included:  CALJIC No. 5.13, defining self-defense and advising that "[h]omicide is justifiable and not unlawful when committed by any person in the defense of himself ...;"  CALJIC No. 1.01 instructions to be considered as a whole; and CALJIC No. 2.90, presumption of innocence - reasonable doubt - burden of proof.

In addition to the standard instruction, CALJIC No. 2.01 (FN10), the jury also received CALJIC No. 2.02:  "The mental state with which an act is done may be shown by the circumstances surrounding the commission of the act. However, you may not find the defendant guilty of the crime charged ... unless the proved circumstances are not only (1) consistent with the theory that the defendant had the required mental state but (2) cannot be reconciled with any other rational conclusion.  [¶]  Also, if the evidence as to any mental state permits two reasonable interpretations, one of which points to the existence of the mental state and the other to its absence, you must adopt that interpretation which points to its absence.  If, on the other hand, one interpretation of the evidence as to the mental state appears to you to be reasonable, and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable."  To this instruction appellant sought to add the following language:  "As to the mental state included in the definition of self-defense, if the evidence permits two reasonable interpretations, one of which points to the existence of the mental state and one points to its absence, you must adopt that interpretation which points to its existence."

> FN10.  CALJIC No. 2.01 states, in pertinent part: "[A] finding of guilt as to any crime may not be based on circumstantial evidence unless the proved circumstances are not only (1) consistent with the theory that the defendant is guilty of the crime, but (2) cannot be reconciled with any other rational conclusion.  [¶]  Further, each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt.  In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance on which the inference necessarily rests must be proved beyond a reasonable doubt.  [¶]  Also if the circumstantial evidence permits two reasonable interpretations, one of which points to the defendant's guilt and the other to

36

1        his innocence, you must adopt that interpretation that points to the
defendant's innocence, and reject that interpretation that points to his
2        guilt...."

3        A defendant has the right to "pinpoint" instructions which directly relate the
theory of the defense, such as self-defense, burden of proof, and reasonable doubt.
4        (People v. Wright (1988) 45 Cal.3d 1126, 1137-38; People v. Adrian (1982) 135
Cal.App.3d 335, 342.)  However, "[i]t is not error for a trial court to reject
5        instructions requested when the substance of the instruction is covered by those
instructions given. [Citations.]"  (People v. Rice (1970) 10 Cal.App.3d 730, 744;
6        People v. Welch (1972) 8 Cal.3d 106, 119-20.)

7        CALJIC Nos. 2.01 and 5.15, together with the other instructions mentioned above,
advised the jury that: (1) the prosecution had the burden of proving appellant did
8        not kill the victim in self-defense; (2) appellant was not required to prove
anything; and (3) if the jury had any reasonable doubt as to whether appellant
9        acted in self-defense, it must acquit.  The substance of the pinpoint instruction
requested by appellant was covered by the court's instructions, and it was not error
10      to reject appellant's proposed modified instruction.

11  (Respondent's Exhibit y, pp. 15-17.)

12        For the reasons stated by the California Court of Appeal, the undersigned finds

13  that the instructions given adequately instructed the jury regarding self-defense.  As noted by

14  respondent in the answer, there is no entitlement to tailor-made instructions that pinpoint certain

15  aspects of the defense.  United States v. Hernandez-Escarsega, 886 F.2d 1560, 1570 (9th Cir.

16  1989) (internal citation omitted) ("Indeed, [s]o long as the instructions fairly and adequately

17  cover the issues presented, the judge's formulation of those instructions or choice of language is a

18  matter of discretion.").  The failure to give the requested instructions regarding self-defense did

19  not violate fundamental fairness.

20        Because the denial of this claim by the California Supreme Court was not an

21  unreasonable application of clearly established Supreme Court authority, this claim should be

22  denied.

23        *Claim Eight*

24        Petitioner argues that the trial court by failing to instruct the jury regarding

25  excusable homicide.  The California Court of Appeal denied this claim for the following reasons:

26        Appellant requested additional instructions on excusable homicide, concerning

1    death as a result of "accident" or "accident" arising from "heat of passion."
     (CALJIC Nos. 5.00 & 5.01.)

2

3    As there was no substantial evidence to support a theory that Rendleman's death
     was a result of an accident, those instructions were not required.  (See Saille, 54
     Cal.3d at 1119; People v. Bohana (2000) 84 Cal.App.4th 360, 370.)  Nor did

4    either theory of accidental death reflect appellant's defense at trial, which was
     self-defense.  The failure to so instruct was not error.

5

6    (Respondent's Exhibit 7, p. 18.)

7            In the traverse, petitioner argues that at trial he claimed, in essence, that if his

8    actions vis-a-vis Rendleman did somehow cause fatal injuries, it was a fluke.  (Dkt. 27, p. 30.)

9    Petitioner argues that,

10           He had not meant to kill or injure the man, only to get himself out of the
             apartment without further injury to himself, and had not acted with sufficient

11           moral culpability to incur criminal liability for the consequences.  He merely
             responded to an assault, in the heat of passion generated by sudden combat.

12   (Id.)

13           After reviewing the record, the undersigned agrees with the California Court of

14   Appeal that there was not sufficient evidence to support an instruction regarding excusable

15   homicide.  Petitioner's defense was that he inflicted only minor blows and kicks to Rendleman,

16   whereas Nunez inflicted the fatal, traumatic kicks and blows.  In any event, the evidence

17   supporting such an instruction was weak.  The outcome of the trial would not have been different

18   had the jury been read an excusable homicide instruction.  No violation of fundamental fairness

19   occurred based on the trial court's failure to give this instruction.

20           Because the denial of this claim was not an unreasonable application of clearly

21   established Supreme Court authority, this claim should be denied.

22           C.  Claim Nine

23           Petitioner alleges that there was insufficient evidence to support his prior robbery

24   conviction.

25           When a challenge is brought alleging insufficient evidence, federal habeas corpus

26   relief is available if it is found that upon the record evidence adduced at trial, viewed in the light

most favorable to the prosecution, no rational trier of fact could have found "the essential

elements of the crime" proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307,

319 (1979). Jackson established a two-step inquiry for considering a challenge to a conviction

based on sufficiency of the evidence. U.S. v. Nevils, 598 F.3d 1158, 1164 (9th Cir. 2010) (en

banc). First, the court considers the evidence at trial in the light most favorable to the

prosecution. Id., citing Jackson, 443 U.S. at 319. "'[W]hen faced with a record of historical facts

that supports conflicting inferences, a reviewing court 'must presume – even if it does not

affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of

the prosecution, and must defer to that resolution.'" Id., quoting Jackson, 443 U.S. at 326.

"Second, after viewing the evidence in the light most favorable to the prosecution,

a reviewing court must determine whether this evidence, so viewed is adequate to allow 'any

rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt.'" Id.,

quoting Jackson, 443 U.S. at 319. "At this second step, we must reverse the verdict if the

evidence of innocence, or lack of evidence of guilt, is such that all rational fact finders would

have to conclude that the evidence of guilt fails to establish every element of the crime beyond a

reasonable doubt." Id.

Superimposed on these already stringent insufficiency standards is the AEDPA

requirement that even if a federal court were to initially find on its own that no reasonable jury

should have arrived at its conclusion, the federal court must also determine that the state

appellate court not have affirmed the verdict under the Jackson standard in the absence of an

unreasonable determination. Juan H. v. Allen, 408 F.3d 1262 (9th Cir. 2005).

The California Court of Appeal denied this claim for the following reasons:

Appellant maintains there was insufficient evidence that he was convicted of
robbery on June 20, 1983, as charged by the prosecution and found true by the
jury.

Appellant does not dispute that the evidence showed, through certified copies of
an abstract of judgment and other documentary evidence, he was convicted in
1983 of robbery in case No. 16279. Instead, he directs our attention to the

documentary evidence which shows the date of this conviction as March 9, 1983. The June 20, 1983, conviction date charged by the prosecution in the information was the date of the original sentencing hearing, at which the imposition of sentence was suspended and appellant was placed on probation.  Following the revocation of his probation for this offense, appellant was sentenced to three years in prison in November 1985.

The finding that appellant suffered this 1983 robbery conviction must be upheld if it is supported by substantial evidence.  (See People v. Johnson (1980) 26 Cal.3d 557, 576-78 (Johnson).)  Although the information incorrectly identified the date of the original sentencing hearing, rather than the date of conviction by the jury, the date was an immaterial variance, not objected to at trial, which does not undermine the jury's finding that appellant suffered this 1983 robbery conviction. Appellant certainly was not misled.  He even conceded to the jury at trial that he had suffered the convictions charged in the information, including this one.  No prejudicial error appears from this variance concerning the date of conviction. (People v. Watson (1956) 46 Cal.2d 818, 836.)

Appellant also challenges his identity as the person convicted of the 1983 robbery offense, claiming:  "the trial court did not determine that it was appellant to whom the particular documents put into evidence concerning this alleged prior referred...."  He is again wrong.  Trial exhibit 15 was a section 969b Department of Corrections packet, containing documents relating to this same conviction, case No. 16279.  Exhibit 15 included appellant's fingerprints, his photograph, and other identifying information.  As to this exhibit, the clerk's transcript indicates the trial court ruled:  "Re: Exhibits 15, 16, 17 and 19 - Court finds that the Defendant is the same person mentioned in each of the prior convictions."

Although the reporter's transcript does not specifically make reference to Exhibit 15, the clerk's transcript certainly did, and both transcripts referenced the fact the court made a finding of identity as to "each" of the prior convictions that were the subject of the jury's findings.  (See People v. Malabag (1997) 51 Cal.App.4th 1419, 1426 [proper to rely on clerk's transcript rather than reporter's transcript to determine court's findings].)  Such findings would obviously include the 1983 robbery conviction.

We therefore reject appellant's contentions as to his 1983 conviction for robbery, because the finding that appellant suffered this conviction was fully supported by substantial evidence.  (Johnson, 26 Cal.3d at 576-78.)

(Respondent's Exhibit 7, pp. 18-19.)

       For the reasons stated by the California Court of Appeal, the undersigned finds

that there was sufficient evidence to support petitioner's conviction for his prior 1983 robbery

conviction.  The identification of the date of the sentencing as the date of conviction was an

immaterial variance.  In addition, there was sufficient evidence in the record that petitioner was

the person convicted of this offense.  In any event, as noted by the state appellate court, petitioner

1   did not dispute the existence of this conviction at trial.

2           Because the denial of this claim was not an unreasonable application of clearly

3   established Supreme Court authority, this claim should be denied.

4   Conclusion

5           The undersigned recommends that petitioner's application for a writ of habeas

6   corpus be denied.  If petitioner files objections, he shall also address whether a certificate of

7   appealability should issue and, if so, why and as to which issues.  A certificate of appealability

8   may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the

9   denial of a constitutional right."  28 U.S.C. § 2253(c)(3).

10          Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a

11  writ of habeas corpus be denied.

12          These findings and recommendations are submitted to the United States District

13  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-

14  one days after being served with these findings and recommendations, any party may file written

15  objections with the court and serve a copy on all parties.  Such a document should be captioned

16  "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

17  objections shall be filed and served within fourteen days after service of the objections.  The

18  parties are advised that failure to file objections within the specified time may waive the right to

19  appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

20  DATED:  June 4, 2010

21

22

23          KENDALL J. NEWMAN
            UNITED STATES MAGISTRATE JUDGE
24

25

26  winn.157

41